UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-                                                    16-CR-595 (JPO)

BRIAN BLOCK,                                OPINION AND ORDER
                                Defendant.

J. PAUL OETKEN, District Judge:

Defendant Brian Block was convicted of securities fraud and related charges following a

three-week jury trial in June of 2017.  The offenses relate to Block's fraudulent preparation of

financial statements in 2014 for American Realty Capital Properties, Inc. ("ARCP"), a publicly

traded real estate investment trust ("REIT") for which he served as Chief Financial Officer

("CFO").

Block has filed a motion for a new trial, alleging that the Government failed to disclose

impeachment information that it became aware of during the trial, in violation of *Brady v.*

*Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).  After careful

review of the record, the Court concludes that although the information was impeaching under

*Giglio*, there is no reasonable probability that its disclosure would have made a difference in the

verdict.  Accordingly, as explained more fully below, Block's motion for a new trial is denied.

I.       **Background**

A.       **Procedural Background**

The Indictment, which was unsealed on September 8, 2016, charged Block with six

counts:

- conspiracy to commit securities fraud, to make false filings with the United States
  Securities and Exchange Commission ("SEC"), and to falsify the books and
  records of ARCP, in violation of 18 U.S.C. § 371 (Count 1);

- securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5 & 18 U.S.C. § 2 (Count 2);

- making false statements in filings with the SEC, in violation of 15 U.S.C. §§ 78m(a) & 78ff, 17 C.F.R. §§ 240.12b-20, 240.13a-11, 240.13a-13 & 18 U.S.C. § 2 (Counts 3 and 4);

- filing a false certification with the SEC, in violation of 15 U.S.C. §§ 78m(a) & 78ff, 17 C.F.R. § 240.13a-14 & 18 U.S.C. § 2 (Count 5); and

- filing a false certification with the SEC, in violation of 18 U.S.C. §§ 1350(c)(1), (c)(2) & 2 (Count 6).

The jury trial began on June 12, 2017, and ended on June 30, 2017, when Block was convicted on all counts.  The jury deliberated for approximately three and a half hours before reaching its verdict.  (Trial Transcript ("Tr.") 2552, 2553.)[1]

On November 8, 2017, this Court sentenced Block to a term of 18 months' imprisonment and a fine of $100,000.

Block filed an appeal to the United States Court of Appeals for the Second Circuit, and that appeal is pending.  The Second Circuit granted Block's motion for bail pending appeal. (Dkt. No. 190.)

On August 2, 2018, while his appeal was being briefed, Block filed with this Court a motion for a new trial under Federal Rule of Criminal Procedure 33 on the ground that the Government had failed to disclose *Brady*/*Giglio* material.  (Dkt. No. 194.)

On August 8, 2018, the Second Circuit granted Block's motion to hold the appeal in abeyance pending resolution of his Rule 33 motion by this Court.

On November 20, 2018, this Court conducted an evidentiary hearing consisting of testimony by Ryan Steel and William Gribbin.  (Dkt. No. 215.)  The parties filed supplemental briefs in December 2018 and January 2019.  (Dkt. Nos. 219, 222, 223.)

_____

[1] The trial transcript is at Docket Numbers 120 through 148.

### B.        The Evidence at Trial

The evidence at trial established that Block, while serving as CFO of ARCP, carried out a scheme to manipulate the financial results of the company in SEC filings in July 2014.  In finalizing the company's second-quarter SEC filings, Block inflated an important financial metric for a REIT—adjusted funds from operations, or "AFFO"[2]— by adding "plug" numbers totaling approximately $13 million for the first six months of 2014.  This resulted in an inaccurate AFFO number being reported in ARCP's second-quarter 10-Q filing.

Two facts about these plug numbers were established at trial beyond any doubt, and indeed were supported by Block's own testimony:  (1) the numbers were added in order to make the company's AFFO-per-share figure meet the earnings targets of the company and the expectations of investors and analysts; and (2) the numbers did not tie to the company's books and records—that is, they did not correspond to any actual entries in the company's general ledger.

In addition to the $13 million plug numbers, Block also manipulated ARCP's share count for the first half of 2014, resulting in an inflated AFFO-per-share calculation in the company's second-quarter 8-K earnings filing.

All of this happened late at night on July 28, 2014, the night before the 10-Q was to be filed.  Two other people were in the room where it happened:  Ryan Steel, ARCP's director of financial reporting, and Lisa McAlister, ARCP's chief accounting officer, both of whom testified at length during the trial.  Although the trial included testimony from several other witnesses, as

---

[2] AFFO is an accounting measure that is viewed as important for evaluating the financial performance of certain kinds of REITs.  It is roughly a "proxy for the underlying cash earnings of the REIT" (Tr. 858) or the "cash flow power of a business on a normalized basis" (Tr. 1554). It is not a measure based on generally accepted accounting principles, or GAAP.  (Tr. 1320–21.)

well as numerous relevant and corroborating documents, Steel and McAlister were the most important witnesses in the Government's case.

Much of the other trial evidence related to a separate issue that was not the basis for the criminal charges but formed an important part of the narrative of events: how to properly account for AFFO—specifically in light of the fact that ARCP, the public company, did not own real estate directly, but rather through an "operating partnership" ("OP"). ARCP itself owned approximately 97 percent of the OP, while the remaining 3 percent was owned by non-public investors in the form of "non-controlling interests" (or "OP units"). (Tr. 139.) Thus, public shareholders in ARCP owned 97 percent, rather than 100 percent, of the company's real estate. (Tr. 138–39.) This gave rise to an ambiguity in how ARCP's financial results could be reported. They could be reported as "*gross*" numbers at 100 percent, based on the performance of the entire OP; or as "*net*" numbers at 97 percent, based on public shareholders' portion of the real estate holdings, *i.e.*, "net" of the non-controlling interests. (Tr. 179.)

Before July 2014, the AFFO calculations in the company's SEC filings for several prior quarters—including Q1 2014—had been based on a *hybrid* of net and gross numbers. All of these calculations started with *net* figures for "net loss," but then used *gross* figures for various "add-backs"—adjustments that typically remove "one-time, non-recurring events or transactions" to arrive at a "normalized" picture of the company's cash flow. (Tr. 1723.)

There were two problems with the use of the hybrid method. First, ARCP had been disclosing in its SEC filings that it was using net numbers. The company's AFFO calculations (until July 2014) were accompanied by the following disclosure: "Amounts are presented net of any non-controlling interest effect where applicable." (*E.g.*, Government Exhibit ("GX") 102 at 67.) Second, the hybrid method had the effect of overstating AFFO—and thus AFFO per share, the single most important metric for the company and investors. (Tr. 870.) By starting with a

net (97-percent) figure for losses, but then using a gross (100-percent) figure to adjust—and thereby reduce—losses, the company was "double dipping" (Tr. 175–76, 992), combining apples and oranges in a manner that was not "logical" (Tr. 1464).  In contrast, using either consistent net figures or consistent gross figures for the calculation would result in the same, accurate AFFO figure (and AFFO per share, assuming an accurate share count is also used).  (Tr. 217.)

Around the time of the Q1 2014 financial disclosure, Ryan Steel, a relative newcomer at ARCP, discovered that the company had been using this hybrid method in reporting AFFO. Recognizing the problem with the hybrid method, he brought it to the attention of management, including Block.  (Tr. 175–82, 187–99.)  Steel then waited for several weeks for an answer to how the company would address the problem going forward.

He did not receive an answer until the night of July 28, 2014, the night before the anticipated Q2 2014 financial disclosure.  That is when Block (in his office and in the presence of Steel and McAlister) created the spreadsheet that is at the center of the charged fraud.  First, Block included the numbers for the Q1 AFFO calculation as reported (*i.e.*, using a hybrid method).  (Tr. 337–38.)  Then he added Q2 AFFO numbers using the net method.  (Tr. 338.) Block then changed both the Q1 and Q2 AFFO numbers, as well as the share numbers, to *gross* numbers.  (Tr. 340.)  The result was a corrected AFFO calculation—but it revealed a lower AFFO-per-share number than ARCP had previously reported for Q1:  23 cents per share as opposed to 26 cents per share.  (Tr. 341; GX 112 at 4 (8K dated May 8, 2014) ("*AFFO in Line With Company Expectations at $0.26 per share*").)

Block proceeded to make adjustments to the spreadsheet that had the effect of disguising the problem that the company had been using the hybrid method in past quarters while ostensibly using a consistent method (gross) for the Q2 filing.  First, he added a number—$11,974,000—to a preexisting line item showing a particular category of Q1 add-backs ("amortization and

write-off of deferred financing fees").  That number was copied from a separate figure that had nothing to do with that add-back (specifically, net loss attributable to non-controlling interests in Q1).  (Tr. 343, 355.)  Second, he decreased the share count from 599 million to 573 million, the same incorrect number that had been used in Q1.  (Tr. 349.)  These changes resulted in an AFFO-per-share figure of 26 cents for Q1.  Third, Block added another number—$1,100,000—to the Q2 line for the same add-back category (amortization/deferred financing).  Again, that number did not tie to any figure in the company's books and records for amortization or deferred financing costs.  (Tr. 351.)  That addition had the effect of changing Q2 AFFO from 23 cents to 24 cents per share.  (Tr. 350–52.)  Finally, for the year-to-date figures (Q1 plus Q2), Block decreased the share count, again using a number that did not tie to the company's records.  (Tr. 352–55, 363–64.)

The effect of these changes on AFFO per share, in rounded numbers, was the following:

| AFFO PER SHARE – ARCP | | |
| --- | --- | --- |
|  | Consistent method (gross) | Block spreadsheet changes (July 28, 2014) |
| Q1 2014 | .23 | .26 |
| Q2 2014 | .23 | .24 |
| YTD 2014 | .46 | .49 |

(Tr. 363, 368.)

Immediately after Block made these changes to the spreadsheet, Steel pointed out that the revisions were not supported by ARCP's financial records.  According to the testimony of both Steel and McAlister, Steel said he was not comfortable with the unsupported changes and told Block and McAlister that he would refer any questions about the changes to them.  (Tr. 357–60, 1036–37.)  Block's own testimony on this point was largely consistent with that of Steel and McAlister.  Block also testified that Steel indicated that he was "uncomfortable" with the

spreadsheet changes (Tr. 2042), but he characterized Steel's concern slightly differently:
"Ryan's concern was, Hey, if someone asks me questions about this, we don't have a schedule."
(Tr. 2041.)  In any event, when Steel subsequently received questions about the changed
numbers, he in fact directed the questions to McAlister and/or Block.  (GX 1078; GX 1080; Tr.
404–11, 2174.)

Despite the concerns he expressed on the night of July 28, 2014, Steel was also
concerned for his job, and he therefore participated in the company's second-quarter SEC filings
the next morning, July 29, which included the unsupported numbers.  (Tr. 380–82.)  In the weeks
that followed, Steel discussed his concerns about the AFFO figures with a number of his
colleagues, including Brandon Koch and William Gribbin, both of whom testified at trial.  (Tr.
1640–41, 1663.)  In early September 2014, Gribbin reported Steel's concerns about the AFFO
calculation to the company's auditors at Grant Thornton.  That led to an investigation by the
audit committee of ARCP's board of directors, ultimately resulting in the termination of Block,
McAlister, and Steel.  (Tr. 1645–47.)  Gribbin also reported the AFFO calculation issue to the
SEC through its whistleblower program.  (Tr. 1647–49.)

### C.    The Steel-Gribbin Conversation

In May 2018, nearly a year after Block's trial, Steel testified during a deposition in a civil
case about a conversation he had had with Gribbin in 2015:

> Q.    And has Mr. Gribbin offered to share with you any award,
> financial award that he receives as a result of his SEC
> whistleblower program submission?
>
> A.    Not that – not really.  There was one time that he – soon after
> I was let go, that we were having a couple drinks at a bar,
> that he referenced how bad he felt for me, that he couldn't
> believe this happened to me and that he would take care of
> me.  He didn't necessarily ever specify what that meant or
> bring it up again.  So there was maybe a discussion of that,
> but there has never been a true offer or follow-up on that.

> Q.    When did this discussion take place when Mr. Gribbin told
>        you he would take care of you?
>
> A.    I think at some point in early 2015.

(Dkt. No. 196-2.)  Steel also testified that he had told the Government about the conversation

with Gribbin, in words "quite similar to what I said today," in "around May of 2017."  (*Id.*)

Because Block had not been made aware of this 2015 conversation between Steel and

Gribbin previously, Block's counsel asked the Government to verify that it had learned of the

conversation before or during the trial.  In response, the Government represented that it had

learned about the conversation from Steel on June 20, 2017—during the trial but after Steel had

testified (Steel testified from June 13 to June 16, 2017).  (Dkt. No. 201 at 7.)[3]  Specifically, as

was later established by declarations of Government counsel:

- On June 19, after Steel had finished testifying but before Gribbin was called to testify, an AUSA spoke by telephone with Steel's counsel, asking him to speak with Steel about whether Steel had any agreement or arrangement with Gribbin regarding any monetary award that Gribbin might receive as a result of Gribbin's SEC whistleblower filing.  (Dkt. No. 226 ¶ 2.)

- Later that day, Steel's counsel relayed to the AUSA, by telephone, (1) that Steel did not have any agreement or arrangement with Gribbin regarding any potential SEC whistleblower award; (2) that Steel recalled that he had had a conversation with Gribbin, in either a bar or a restaurant, during which Gribbin said that he might be able to provide Steel with some portion of his whistleblower award; and (3) that Steel had contemporaneously rejected Gribbin's suggestion.  Later that evening, the AUSA sent an email to Steel's counsel, stating that the Government wished to speak to Steel "directly about the conversation you relayed to us and also whether [Steel] has any existing expectation that he'll get any portion of any recovery."  (Dkt. No. 226 ¶ 3.)

---

[3] The Government initially informed Block's counsel that it had learned about the conversation from Steel "in advance of Block's trial," but it later corrected that statement, representing that Steel had told the Government about the conversation on June 20, 2017.  (Dkt. No. 195 at 8; Dkt. No. 196-3; Dkt. No. 196-11.)  During the evidentiary hearing on November 20, 2018, Steel also corrected his deposition testimony that he had informed the Government about the conversation in May of 2017:  "Through discussions with my lawyers and recollections of the events, I recall subsequent to that that it was on either June 19th or June 20th."  (Dkt. No. 215 at 12.)

- On the following day, June 20, the AUSA had a telephone conversation with Steel. In that conversation, Steel stated (1) that he had once had a conversation with Gribbin during which Gribbin said that he might be able to assist Steel financially; (2) that Steel had contemporaneously rejected any suggestion of financial assistance from Gribbin; (3) that Steel never had any agreement, arrangement, or understanding with Gribbin to receive any portion of any whistleblower award that Gribbin might receive; and (4) that Steel had no existing expectation that he would share or otherwise recover any portion of a whistleblower award from Gribbin. (Dkt. No. 226 ¶ 5.)

- Also on June 20, another AUSA on the trial team had a conversation with Gribbin, in which he asked whether Gribbin had any understanding, expectation, or agreement that he would share with Steel any whistleblower award he might receive. Gribbin replied that he had no such understanding, expectation, or agreement. Gribbin also stated that he did not recall any conversation with Steel on the topic. (Dkt. No. 227 ¶ 3.)

## II.     Legal Standards

### A.     Rule 33 Motion During Pendency of Appeal

Rule 33 of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). However, "[i]f an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case." Fed. R. Crim. P. 33(b)(1). The pendency of an appeal ordinarily divests a district court of jurisdiction over the case. *See United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996).

Nevertheless, the Second Circuit has held that a district court may deny a Rule 33 motion while an appeal is pending. *See United States v. Camacho*, 302 F.3d 35, 36–37 (2d Cir. 2002) (citing *United States v. Cronic*, 466 U.S. 648, 667 n.42 (1984)). A district court may also "signal its intention" to grant a Rule 33 motion for a new trial, allowing the Court of Appeals to consider a motion to remand the case. *Camacho*, 302 F.3d at 36–37.

**B.**      ***Brady* and *Giglio***

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that the

prosecution in a criminal case has a duty to disclose evidence that is favorable to the accused and

material to guilt.  That duty extends to impeachment information regarding government

witnesses.  *Giglio v. United States*, 405 U.S. 150, 154 (1972).  "Impeachment evidence is

evidence having the potential to alter the jury's assessment of the credibility of a significant

prosecution witness."  *United States v. Madori*, 419 F.3d 159, 170 (2d Cir. 2005) (internal

quotation marks and citation omitted).  The Government's duties under *Brady* and *Giglio* are

violated if it withholds information that, "if suppressed, would deprive the defendant of a fair

trial."  *United States v. Bagley*, 473 U.S. 667, 675 (1985).  Such a deprivation occurs only where

there is a "reasonable probability" that the suppression "affected the outcome of the case," or

would have "put the whole case in such a different light as to undermine confidence in the

verdict."  *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001) (citation omitted).  Thus,

there "is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a

reasonable probability that the suppressed evidence would have produced a different verdict."

*Strickler v. Greene*, 527 U.S. 263, 281 (1999).

## III.   Discussion

Block contends that the Government's failure to disclose to the defense what it knew

about the Steel-Gribbin conversation during the trial violated the prosecution's duties under

*Brady* and *Giglio*, depriving Block of a fair trial.  With that information, Block argues, his

counsel could have impeached Steel, the Government's most important witness, with a potential

financial incentive to inculpate Block.  (Dkt. No. 195 at 13–14.)

Block's argument turns on two issues: (1) whether the undisclosed information was

"impeaching" for purposes of *Giglio*, and (2) whether the nondisclosure was material (or

prejudicial), meaning that there is a "reasonable probability" that the information, if disclosed to the defense, would have changed the outcome of the trial.  *See Coppa*, 267 F.3d at 135.

## A.     *Giglio* Impeachment Material

The parties appear to agree that the existence of an offer by Gribbin to share any anticipated SEC whistleblower award with Steel—standing by itself, and certainly if accepted by Steel—would constitute impeaching material under *Giglio*.  That is because the prospect of such a financial award might show a witness's motive, bias, or interest: an SEC whistleblower award could potentially be in the millions of dollars, and a testifying witness might assume that the odds of a large award are increased by a conviction of the defendant.  Thus, the Government disclosed the fact that Gribbin had applied for a whistleblower award prior to his testimony at trial, and Block's counsel cross-examined Gribbin about the fact that he stood to gain money as a whistleblower.  (Tr. 1655–58.)

The Government argues, however, that the Steel-Gribbin conversation, as the Government understood it during trial, was not impeaching because Steel "*contemporaneously declined* the idea of receiving any money from Gribbin, and . . . had *no understanding or agreement* with Gribbin that he would receive any portion of any whistleblower award."  (Dkt. No. 201 at 12–13 (quoting June 4, 2018 email from Gov't) (emphasis in Gov't brief).)  Indeed, the Government contends that testimony about the conversation would have *bolstered* Steel's credibility by "show[ing] that Steel had no motive to skew his testimony."  (Dkt. No. 201 at 1; *see also* Dkt. No. 222 at 7.)

The Court is not persuaded by the Government's argument.  First, the mere offer or prospect of an award may be impeaching where it supports an inference of a witness's personal interest in the defendant's conviction.  *See Bagley*, 473 U.S. at 683 (opinion of Blackmun, J.) ("This possibility of a reward gave [the prosecution witnesses] a direct, personal stake in [the

defendant's] conviction" even though "the stake was not guaranteed through a promise or a binding contract."). Thus, the fact that any discussion of possible award-sharing did not rise to the level of an "agreement" does not categorically render the discussion non-impeaching. Even assuming that the jury would credit both parts of the Steel-Gribbin conversation as reported—that is, not only Gribbin's offer of assistance but also Steel's contemporaneous rejection—the jury might still find that Steel's testimony could have been colored by the offer itself, including a perceived possibility that it still lurked in the background.

Second, the jury might not credit both parts of the conversation:  it might believe the testimony about Gribbin's offer of assistance but *disbelieve* Steel's testimony that he immediately rejected any assistance. The Government characterizes the Steel-Gribbin conversation as basically a single unit of information. Perhaps that is understandable given how the information came to the Government's attention:  the Government asked Steel, initially through counsel, whether he had any "agreement or arrangement" with Gribbin regarding any whistleblower award that Gribbin might receive; the answer to that question was "no." But in the course of getting that answer, the Government learned about a specific conversation that was potentially significant—a conversation that may have included an offer to give Steel a piece of a whistleblower award. In light of the significance of such an offer, its impeachment value cannot be so easily extinguished by testimony that it was rejected. Even if it was a close question, the Government should have disclosed the conversation.  "[A]s the Supreme Court has pointed out, a prosecutor 'anxious about tacking too close to the wind will disclose a favorable piece of evidence.'"  *Coppa*, 267 F.3d at 143 (quoting *Kyles v. Whitley*, 514 U.S. 419, 439 (1995)).

The Court concludes that the Steel-Gribbin conversation, as understood by the Government during trial, constitutes impeachment material within the meaning of *Giglio*.

### B.     Materiality of Nondisclosure

In order to require a new trial, the nondisclosure of impeaching material must also be material or prejudicial to the defendant.  The "evidence in question [must] 'create[] a reasonable doubt that did not otherwise exist.'"  *United States v. Romero*, 54 F.3d 56, 60–61 (2d Cir. 1995) (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)).  A defendant meets this standard "by showing a 'reasonable probability' of a different result if the defense had learned of the evidence earlier."  *United States v. Rittweger*, 524 F.3d 171, 182 (2d Cir. 2008).

On November 20, 2018, the Court held an evidentiary hearing for the purpose of assisting with the determination of the materiality issue.  Specifically, the Court was seeking to assess how Steel's and Gribbin's testimony would have been different in the counterfactual scenario in which the Government had disclosed to the defense during trial the information about the Steel-Gribbin conversation.  Before turning to the overall evidence in the case, the Court addresses the evidence adduced during that hearing.

### 1.     The November 20, 2018 Evidentiary Hearing

At the hearing on November 20, 2018, the Court heard testimony from Steel and Gribbin about the conversation at issue.

*Steel's Testimony.*  At the November 2018 hearing, Steel testified as follows:

- In January or February of 2015, after Steel's termination, Steel and Gribbin had a conversation at a local bar in suburban Philadelphia.  (Dkt. No. 215 at 8.)

- Gribbin asked Steel "how the job search was going"; Gribbin said "he never thought [Steel] would be let go" and "he felt horrible about it."  (Dkt. No. 215 at 9.)

- Gribbin said "well, you know, I can help you – I can take care of you if you need it, I can help you out."  (Dkt. No. 215 at 9.)

- When asked his understanding of what Gribbin was suggesting, Steel testified, "I believe he was suggesting emotional support as a friend" and that in Steel's mind "there was no connection at all" to a potential SEC whistleblower award that Gribbin might receive.  (Dkt. No. 215 at 9–10.)

13

- Steel testified that he responded by saying: "[T]hank you.  I appreciate that.  That means a lot to me, but don't worry about it, I'm OK."  (Dkt. No. 215 at 9.)  In his response Steel intended to convey "[b]asically that I was thanking him for the emotional support as a friend but that there really wasn't a financial offer in his statement and that he shouldn't even be talking about that."  (Dkt. No. 215 at 10.)

- This conversation occurred at the end of the night, after each man had had three or four drinks.  (Dkt. No. 215 at 9.)

- On cross-examination, Steel reiterated that, at the time of the conversation, he had not understood Gribbin to be offering to "take care of [Steel] financially."  (Dkt. No. 215 at 80.)

*Gribbin's Testimony.*  At the November 2018 hearing, Gribbin testified as follows:

- Gribbin recalled having a conversation with Steel that touched on the fact that Steel was unemployed, but he did not remember whether the conversation was in person or over the phone.  (Dkt. No. 215 at 115.)

- Gribbin testified:  "I told him since he's out of work, if I came into money I could help him out."  (Dkt. No. 215 at 115.)  Gribbin "was thinking about any potential SEC award."  (Dkt. No. 215 at 116; *see also id.* at 142.)

- As to Steel's response, Gribbin testified:  "I don't remember his exact words but it was 'No.  Thank you.'  He rejected it."  (Dkt. No. 215 at 116.)

- Gribbin testified that there was never any understanding, expectation, or agreement with Steel to provide him with any whistleblower money that Gribbin might receive.  (Dkt. No. 215 at 117, 118, 119.)

- Gribbin stated that he had not recalled the conversation during the trial because "[i]t was such a non event conversation . . . .  I really had forgotten about it and moved on.  It was such a quick conversation."  (Dkt. No. 215 at 118.)  He later recalled the conversation, "[s]ometime in the last six months," in the course of following the case filings on PACER.  (Dkt. No. 215 at 118.)

This recent testimony is somewhat different from the earlier characterizations of the conversation.  Steel testified that when Gribbin had said "I can help you out" in the 2015 conversation, Steel had understood Gribbin to be offering "emotional support," *not* financial support, and with "no connection" to any whistleblower award.  (Dkt. No. 215 at 9–10.) Meanwhile, Gribbin's testimony went in the other direction:  unlike during trial, when he did not

14

recall the conversation, he now recalled that he had said "if I came into money I could help him out" and that Gribbin "was thinking about any potential SEC award."  (Dkt. No. 215 at 115–16.)

The question is what all the evidence—including this recent testimony of Steel and Gribbin—shows about how the trial evidence would have been different had the defense team been made aware of the 2015 Gribbin-Steel conversation during trial.  This includes assessing both (1) whether and how testimony about the *conversation itself* might have suggested to the jury that Steel had some motive or interest in Gribbin's whistleblower award, and (2) whether and how the credibility of Steel (or Gribbin) might otherwise have been impugned by defense counsel's cross-examination on the subject.

What would evidence of the conversation itself have looked like at trial?  There are three data points:  (1) the Government's June 2017 discussions with Steel and Gribbin during trial; (2) Steel's May 2018 deposition testimony; and (3) Steel's and Gribbin's November 2018 testimony in the evidentiary hearing.

The June 2017 discussions were the closest in time to the conversation and therefore might seem to be the most reliable proxy for how Steel and Gribbin would have testified at the time.  However, this evidence is indirect:  it is based on recollections by Government counsel of statements made to them, in some instances through a witness's counsel.[4]  (*See* Dkt. Nos. 225, 226, 227.)  It is therefore the least reliable *form* of evidence, since the actual words could easily have been lost in translation.

In any event, the seeming inconsistency in Steel's description of the conversation may be less than meets the eye:  it is not clear from Steel's earlier versions of the conversation that he ever indicated that Gribbin had explicitly offered financial support (or a share in any

---

[4] The Government apparently did not take contemporaneous notes of its conversations with Steel and Gribbin on June 19 and 20, 2017.  (*See* Dkt. No. 201 at 14 n.7.)

whistleblower award); that seems to have been a possible *interpretation* on Steel's part—and it may be merely Steel's interpretation (if anything) that evolved over time. Thus, Steel's May 2018 deposition testimony—the only prior version of the conversation that was under oath and that did not suffer from the game-of-telephone problem referenced above—stated that Gribbin had offered to "take care of" Steel but then added that Gribbin "didn't necessarily ever specify what that meant or bring it up again." And while Steel's testimony in November 2018 was that he understood Gribbin to be offering "emotional support" with "no connection" to a whistleblower award, his testimony about his response to Gribbin—"don't worry about it, I'm OK"—allowed for some ambiguity in Gribbin's offer: Steel said that he intended to convey "[b]asically that I was thanking him for the emotional support as a friend but that there really wasn't a financial offer in his statement and that he shouldn't even be talking about that." Steel also explained that his earlier discussions with the Government (during the trial) had included "speculation" on his part: "[A]lthough[] I never understood it to be this way, my mind naturally went to a financial type 'take care of you' relation. So I speculated about some financial items and I guess maybe I wasn't clear always that I was speculating." (Dkt. No. 215 at 108.)

That leaves Gribbin's November 2018 testimony, in which he clearly did characterize his offer as one of financial assistance ("I told him since he's out of work, if I came into money I could help him out"). Because Gribbin did not recall the conversation at the time of trial, one might think it likely that, if asked about it at trial, he would have testified that he simply did not recall the conversation. Indeed, in his recent testimony Gribbin explained that his recollection about the conversation had only been refreshed by his reading of the filings in this case in the past six months—*i.e.*, the filings in connection with this motion. (Dkt. No. 215 at 118.)

Again, however, it is difficult to conclude simply from the indirect evidence of the Government's conversations in June 2017 that Gribbin would not have recalled the conversation

if asked about it directly under oath.  It is just as likely that his recollection would have been refreshed by direct questioning, which would have occurred after Steel testified about the conversation.

In any event, one thing that is consistent among all the various versions of the conversation—including the sworn testimony of both Steel and Gribbin—is that Steel declined Gribbin's offer of assistance, and that the two never had any understanding or agreement by which Gribbin would provide financial assistance to Steel.

Based on all of these considerations, the Court finds it reasonably likely that *Steel* would have testified about the conversation, in sum and substance, as follows:

- Gribbin and Steel had a conversation at a bar in suburban Philadelphia in January or February 2015, after Steel's termination.

- After a few drinks, Gribbin asked Steel about his job search, said he felt horrible for Steel, and said he could help him out or take care of him.

- Steel responded with words to the effect of "thanks, don't worry about it; I'm OK."

- Steel did not understand Gribbin to be offering him financial assistance, although he realized that one could have interpreted it that way.

- Steel never had an understanding or agreement with Gribbin to receive a share of any whistleblower award that Gribbin might receive.

The Court finds it reasonably likely that *Gribbin* would have testified about the conversation, in sum and substance, as follows:

- Gribbin recalls that he and Steel had a brief conversation at some point after Steel's termination, although Gribbin does not remember whether the conversation took place by phone or in person, and if so where it took place.

- During the conversation Gribbin said that he could help out Steel if Gribbin came into money.  Gribbin does not recall mentioning a potential SEC whistleblower award, although that is what Gribbin had in mind.

- Steel rejected the offer, saying words to the effect of "No, thank you."

- Gribbin never had an understanding or agreement with Steel to provide a share of any whistleblower award that Gribbin might receive.

How significant would this testimony have been in impeaching Steel as a witness?  As explained previously, evidence about the conversation itself could have suggested to the jury that Steel hoped to receive a portion of Gribbin's whistleblower award and therefore had a motive to shade his testimony in favor of making Block appear more culpable.  The Court finds, however, that the impeachment effect of this testimony would have been relatively minor in the context of all the trial evidence.

In the first place, the uncontradicted testimony of both Steel and Gribbin would have been that Steel contemporaneously declined Gribbin's offer of assistance.  Viewed in light of the entirety of Steel's testimony, the Court finds that that testimony likely would have been credited by the jury.  Steel was an extraordinarily believable witness at trial.  He testified in great detail over the course of four days with clarity and composure.  Block argues, with some force, that Steel's credibility is precisely why this potential impeachment evidence was so important.  But having observed Steel's testimony at the recent hearing, the Court concludes that he would have testified forcefully and credibly in response to cross-examination that he was not motivated by any hope or expectation of a financial reward flowing from the 2015 conversation with Gribbin.[5]

That is not to say that impeachment by the defense based on the conversation itself, and Steel's and Gribbin's testimony about it, would have had no effect.  The Court assumes that defense counsel would have skillfully highlighted the most significant discrepancy between Steel's and Gribbin's accounts of the 2015 conversation:  Gribbin's recollection that he had

---

[5] On July 5, 2018, a year after the trial, Steel filed his own whistleblower application with the SEC.  (Dkt. No. 215 at 62.)  There is no evidence, or suggestion, that Steel intended to file such an application at the time of his trial testimony, much less that the Government was aware of any such intention.  It is therefore irrelevant to Block's motion under *Brady* and *Giglio*.

suggested financial support compared to Steel's testimony that Gribbin had merely offered to

"help him out" emotionally.  Of course, the Government presumably would have sought to blunt

any damage to Steel's credibility by highlighting that (1) it is not surprising that two people

would not remember a two-year-old conversation exactly the same way, (2) Steel had a better

recollection of the conversation overall, (3) what matters is Steel's understanding of the

conversation, and (4) both witnesses agreed that Steel declined any support from Gribbin.

But even assuming that this testimony would have resulted in some measure of damage to

Steel's credibility, the Court is convinced that all the corroborating evidence in the case still

would have resulted in a conviction.  The Court now turns to that evidence.

### 2.    Assessment of Materiality in Light of the Trial Evidence

Ryan Steel was an important witness in the Government's case.  He testified in detail

about the precise steps that Block took on July 28, 2014 to manipulate ARCP's financial

numbers and commit the charged crimes, as well as about Block's relevant conduct before and

after that night.  But there are two overarching considerations that make it clear to the Court that

the verdict would have been the same if Steel had been impeached by evidence of his 2015

conversation with Gribbin.  The first is that there was corroborating evidence of virtually every

important element of Steel's testimony.  The second is that very little of that testimony was

actually disputed by Block.

First, several witnesses—including Block—testified, and the documents corroborated,

that Steel had identified the problem of ARCP's use of the hybrid method for calculating AFFO

some months before the Q2 2014 filing date.  Although Block never admitted in his testimony

that it was wrong or misleading to use the hybrid method, he did agree that Steel "had a point"

(Tr. 1884) and that "[t]here was merit in doing it on a more consistent basis" (Tr. 1906).  In any

event, Block was sufficiently persuaded to switch to a consistent (gross) method in the Q2 filing. (Tr. 1935, 2122.)

Second, all the crucial details about what Block actually did in modifying the 2014 numbers on the night of July 28 were undisputed. Steel walked through every change that Block made on the spreadsheet in (1) switching from the hybrid to the gross method for the AFFO calculation and then (2) inserting plug numbers to meet the company's AFFO expectations. Not only did Lisa McAlister credibly corroborate Steel's testimony, but Block did as well. He fundamentally agreed with Steel's description of the actual changes he made to the spreadsheet. (Tr. 1934–41, 2029–40.)

The important difference in Block's own testimony—and ultimately his principal defense—was his assertion that he had a subjective justification for the plug numbers. Block testified that he had a "new add-back in mind" (Tr. 1936, 2033)—that the changes were justified as a reasonable estimate of costs relating to debt defeasance.[6] As defense counsel argued in summation, this justification was "in Brian's head" (Tr. 2414):

> The issue comes down to what was in Brian's head.
> I mean if in Brian's head was this notion that you could have an add-back based on defeasance . . . and I'll tie up the numbers at the end of the year, if that's in his head there is no criminal intent. There is no criminal intent.
> . . . .
> You can't get there. . . . You really have to find that they have proven to you beyond a reasonable doubt that he didn't have in his head this idea that this add-back works. And nothing in this record gets you there.

---

[6] Block testified: "At a high level, [the new add-back] represented the spread between high-price debt that we assumed from making transactions to our current cost of borrowing as of June 30th." (Tr. 1936.) "It directly relates to . . . this differential or spread between the higher debt that we assumed from Cole Capital, Caplease that was above market and our current cost of borrowing that we would benefit from on a go-forward basis. That was the rationale for this adjustment." (Tr. 1939.)

(Tr. 2421.)  But Steel never testified to what was in Block's mind, nor could he do so.  He testified to what Block did and said.  According to both Steel and McAlister, Block did not say anything on the night of July 28 about "defeasance" as justifying the changed numbers.  (Tr. 358–59, 1252, 1257.)  Indeed, Block did not offer any clear testimony that he told Steel or McAlister that his changes were based on the concept of "defeasance"; he testified vaguely that he believed they had an "understanding" of his rationale for the changes.  (Tr. 2135, 2144, 2170.) Nor were there any contemporaneous schedules or other documents supporting the idea that defeasance explained the manipulated numbers, as Block had to admit.  (Tr. 1941, 2134–35.) The Government's cross-examination of Block on his explanation of the changed numbers was devastating, irrespective of any testimony by Steel.  (Tr. 2122–23, 2127–31, 2134–35, 2161–62, 2170–71.)  In short, the jury's assessment of Block's main defense—that the plug numbers were justified as an estimate of defeasance costs—was based essentially on its assessment of Block's testimony, not that of Steel.

Third, Steel's version of events was corroborated by evidence of his conduct after July 28, 2014.  He reported what had transpired on July 28 to Gribbin (within days) and to Brandon Koch (within weeks), both of whom testified.  (Tr. 1641–44, 1663–64.)  When Steel began receiving emails questioning the changed AFFO numbers, he forwarded the emails to McAlister and Block, just as he had told them on July 28 he intended to do.  (GX 1078, 1080.)  Perhaps most significantly, in Steel's first meeting with the Government, on December 19, 2014—before the conversation with Gribbin in 2015—Steel laid out in detail exactly what he testified to at trial, including every step of Block's changes to the numbers on July 28, 2014, and Steel's reaction.  (Dkt. No. 222, Ex. 1.)  Had Block sought to impeach Steel with information about the 2015 Gribbin-Steel conversation, Steel's prior consistent statements would have been admissible

under Federal Rule of Evidence 801(d)(1)(B).  This would have been powerful evidence buttressing Steel's testimony.

Finally, the defense impeached Steel regarding other matters.  First, of course, defense counsel sought to impeach him with his nonprosecution agreement, suggesting that he had a motive to testify favorably to the Government to avoid prosecution.  (Tr. 788–99, 2420–21.)  In addition, the defense sought to impeach Steel in several other respects:  through his involvement in circulating and filing the manipulated Q2 numbers late July 2014 (Tr. 426–42, 661–73, 693–94, 709); his emails using the hybrid method without any suggestion of impropriety in May and June 2014 (Tr. 650–60); his being the source of the plug number added to the "deferred financing costs" line (Tr. 703–06); his not having a problem with a $38 million error in Q1 2014 (Tr. 720–26); and the fact that Steel did not stop or report Block after Block's manipulation of the numbers (Tr. 709–12).  *See United States v. Spinelli*, 551 F.3d 159, 165 (2d Cir. 2008) ("[I]f the information withheld is merely cumulative of equally impeaching evidence introduced at trial, so that it would not have materially increased the jury's likelihood of discrediting the witness, it is not material.").

For these reasons, based on the entire trial record, the Court concludes that the undisclosed *Brady/Giglio* evidence does not undermine confidence in the jury's verdict.

## IV.    Conclusion

Although the 2015 Gribbin-Steel conversation might have been potentially impeaching of Steel's credibility, this is not a case in which "the witness at issue supplied the only evidence linking the defendant[] to the crime."  *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995) (internal quotation marks and citation omitted).  Steel's testimony was not only corroborated by extensive credible evidence, but was largely undisputed.  In light of all the evidence at trial, there

22

is no reasonable probability that the undisclosed evidence would have resulted in a different outcome at trial.  Accordingly, Block's motion for a new trial is denied.

The Clerk of Court is directed to close the motion at Docket Number 194.

SO ORDERED.

Dated: March 19, 2019
       New York, New York

_____
                        J. PAUL OETKEN
                   United States District Judge